UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEAK N SHAKE INC. (F/K/A STEAK N SHAKE OPERATIONS, INC.), | **COMPLAINT** |
| Plaintiff, | |
| - against - | Case No: 20-cv-6096 |
| WILMINGTON TRUST, NATIONAL ASSOCIATION, | |
| Defendant. | |

Plaintiff Steak n Shake Inc. (f/k/a Steak n Shake Operations, Inc.) ("Steak n Shake" or the "Company"), by and through its undersigned counsel, hereby submits this complaint against Defendant Wilmington Trust, National Association ("Wilmington"), in its capacity as Administrative Agent and Collateral Agent under the parties' March 19, 2014 credit agreement ("Credit Agreement"). Steak n Shake respectfully alleges as follows:

## NATURE OF THE DISPUTE

1.     This action arises out of Wilmington's unlawful refusal to take required actions under the Credit Agreement, in breach of its contractual obligations, thereby preventing Steak n Shake from taking steps to maximize the value of its business.

2.     Pursuant to the Credit Agreement, Steak n Shake borrowed funds (the "Loans") in 2014 from various financial institutions ("Lenders"), for which Wilmington acts as Administrative Agent and Collateral Agent. In that role, Wilmington holds collateral on behalf of the Lenders, as security for Steak n Shake's performance of its obligations under the Credit Agreement.

3.      The Credit Agreement unambiguously provides the Company with the right to sell up to $50 million of its real and other property assets at fair market value for cash and, subject to the absence of a Default or an Event of Default, reinvest the proceeds in fixed or capital assets without interference from Wilmington or the Lenders.  If the Company elects to dispose of assets in that manner, the Credit Agreement provides that Wilmington, as Administrative Agent, shall take such actions as shall be required to release any security interest it has in the property "without notice to, or vote or consent of, any Lender."

4.      For commercial reasons that would benefit all of the Company's stakeholders, Steak n Shake decided to sell certain real property currently used by a number of its restaurants, and reinvest the proceeds in its business.  Although Steak n Shake has the authority to do this under the Credit Agreement—and urgently needs to do so—Wilmington has refused to release its security interest in the real estate the Company sells, and in doing so has willfully breached its obligations under the Credit Agreement.

5.      Not only are Wilmington's actions in violation of its contractual obligations, but they interfere with efforts to increase the value of the business and prejudice all of the Company's stakeholders.  With each day that Wilmington refuses to abide by the Credit Agreement, the Company loses valuable time, resources and potential opportunities to maximize the value of its assets.

6.      Accordingly, Steak n Shake seeks a declaration from this Court that it has the authority under the Credit Agreement to dispose of up to $50 million of its real property, and that upon doing so, Wilmington is obligated to release its security interest in those properties.

## THE PARTIES

7.     Plaintiff Steak n Shake is an Indiana corporation with its principal place of business at 107 S Pennsylvania St., #400, Indianapolis, Indiana, 46204.

8.     Defendant Wilmington Trust, a Delaware corporation, is a bank and trust company with its principal place of business in Wilmington, Delaware.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states of the United States, and the matter in controversy exceeds the sum or value of $75,000 exclusive of costs and interest.  Further, under Section 10.09(b) of the Credit Agreement, Steak n Shake and Wilmington have consented to the exclusive jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan and the United States District Court for the Southern District of New York.

10.     Venue is proper in this district pursuant to 28 U.S.C.  §  1391(b)(2) because Wilmington consented to venue in this district under the Credit Agreement.  Sections 10.09(b) and 10.09(c) of the Credit Agreement provide that venue is proper in the United States District Court for the Southern District of New York and that Wilmington "waives, to the fullest extent permitted by applicable Legal Requirements, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this [Credit] Agreement or any other Loan Document in any court referred to in Section 10.09(b)."

## ALLEGATIONS

11.     Steak n Shake is a fast-casual restaurant chain, with 337 locations in 16 states as of June 30, 2020.

12.     On March 19, 2014, Steak n Shake and two of its subsidiaries entered into a Credit Agreement through which the Lenders agreed to extend $220,000,000 of credit in the form of term loans to Steak n Shake.  The Credit Agreement is annexed hereto as **Exhibit A**.[1]

13.     Jefferies Finance LLC originally served as Collateral Agent and Administrative Agent for the Lenders.  Wilmington later succeeded Jefferies Finance LLC in those roles.

14.     The Loans are secured by Steak n Shake's assets, including real property that it owns and uses to operate its restaurants, including those properties identified in **Exhibit B**.

15.     Section 6 of the Credit Agreement sets forth, among other things, circumstances in which Steak n Shake can sell the property that serves as Collateral for the Loans.  Specifically, Section 6.06(b) of the Credit Agreement, titled "Asset Sales," provides that Steak n Shake is permitted to sell its real and other property without interference from Wilmington or the Lenders if:

> (i) the aggregate consideration received in respect of all dispositions of property pursuant to this clause [does] not exceed $50,000,000 during the term of this Agreement,
>
> (ii) such dispositions of property are made for Fair Market Value and on an arms-length commercial basis,
>
> (iii) at least 80% of the consideration payable in respect of such disposition of property is in the form of cash or Cash Equivalents, and
>
> (iv) [Steak n Shake] uses the proceeds of the disposition to prepay the Loans as and to the extent required by Section 2.10(c).

16.     Section 2.10(c), in turn, provides that Steak n Shake is *not* required to prepay the Loans with the proceeds from such sales to the extent that (i) it would not cause a Default or Event

---

[1] Unless otherwise indicated, capitalized terms have the same meaning as set forth in the Credit Agreement.

of Default (as defined in the Credit Agreement); and (ii) the proceeds "are *reasonably expected to be reinvested in fixed or capital assets of any Loan Party* within 360 days following the date of such Asset Sale."

17.     Accordingly, under Sections 6.06(b) and 2.10(c) of the Credit Agreement, Steak n Shake may sell its real property assets if (1) the consideration received for the sales would not result in exceeding the $50,000,000 cap; (2) the sales were arms-length transactions made for fair market value; and (3) at least 80% of the proceeds received from the sales is in cash.  Further, Steak n Shake is *not* required to use the proceeds from the sale to prepay the Loans, and can instead reinvest the proceeds of such sales in its business, if there is no Default or Event of Default.

18.     Under these conditions, Wilmington must release any security interest it has in the property the Company sells:  Section 9.14(c)(i) provides that Wilmington "*shall* . . . take such actions as shall be required to release its security interest in any Collateral subject to any disposition permitted by the Loan Documents [which includes the Credit Agreement]."  In other words, so long as the conditions set forth in Section 6.06(b) are met, Wilmington must release any security interest it has in the Steak n Shake assets that are being disposed of.  This provision is non-discretionary.

### Wilmington Refuses to Comply with the Credit Agreement

19.     Steak n Shake has the express authority under the Credit Agreement to sell its real property without the consent of Wilmington or the Lenders, and without using any of the proceeds to pay down any portion of the Loans.

20.     Specifically, all of the conditions set forth in Section 6.06(b) are met:

    a.     *First*, Steak n Shake is seeking to sell only between $6,225,000 and $9,225,000 of its property, and to date has disposed of assets under Section 6.06 with proceeds totaling approximately $7,696,000.  *See* Section

6.06(b)(i) (providing that the consideration received for the sales cannot exceed $50,000,000).

b.   *Second*, the offers the Company is considering are for fair market value and resulted from the Company's advisors' comprehensive and arms-length outreach to potential purchasers.  *See* Section 6.06(b)(ii) (providing that the sales must be arms-length transactions made for fair market value).

c.   *Third*, all contemplated sales are for cash.  *See* Section 6.06(b)(iii) (providing that at least 80% of the proceeds received from the sales is in cash); and

d.   *Fourth*, the Company is not currently in default and would not be as a result of the reinvestment of such sale proceeds.  *See* Section 6.06(b)(iv) (providing that the Company uses the proceeds consistent with Section 2.10(c), which in turn requires that no Default or Event of Default exists or would arise from the reinvestment of such sale proceeds).

21.   This being the case, Wilmington is obligated under Section 9.14(c) of the Credit Agreement "to release its security interest in [the] Collateral subject to [the] disposition."

22.   Steak n Shake has been fully transparent with Wilmington and the Lenders regarding its proposed sale of these properties.  In response, Wilmington has only delayed and interfered with Steak n Shake's efforts at every turn by issuing onerous requests for information that is either irrelevant, or that the Company has no obligation to provide—and that Wilmington had no right to demand.

23.   For example, Wilmington has demanded that the Company provide "[d]ocuments indicating the amount of consideration received by the Borrower from each disposition of Cracker Barrel Shares and Lion Fund Interests that the Borrower agreed to effect since the Closing Date."

*See* July 27, 2020 Letter from M. Messersmith to C. Clark, at 2.  Neither of those entities is a party to the Credit Agreement and the dispositions Wilmington references are wholly irrelevant to its contractual obligation to release its security interest in the real property the Company plans to dispose of.

24.     Although the Company has nevertheless worked in good faith to supply Wilmington with the information it requested and to which it is entitled, Wilmington has persisted in its threats not to release its security interest in the collateral.  For example, on July 20, 2020, the Company wrote to Wilmington and (i) specified the transactions it would undertake (including by identifying the specific properties the Company planned to dispose of), (ii) described how the sales complied with the Credit Agreement (including by stating that the Company planned to dispose of the properties through a public auction, for 100% cash consideration, and that the sales are expected to be for $7-10 million), and (iii) asked, again, that Wilmington comply with its obligations under the Credit Agreement and release the corresponding collateral.  Counsel for Wilmington wrote back to the Company on July 27, 2020, requesting even more information and giving no indication that Wilmington would comply with its obligations to release the collateral under the Credit Agreement.

25.     On July 30, 2020, the Company wrote to Wilmington again and formally requested that Wilmington release its security interest in any real property the Company planned to sell.  By this time, Wilmington had received all of the information and materials it had requested from the Company related to the proposed real estate transactions.

26.     Nevertheless, Wilmington refused again to release the collateral.  On July 31, 2020 Wilmington responded to the Company's letter, asserting that Wilmington's obligation to release the collateral is subject to the Company having "previously provided to [Wilmington] such

certifications or documents as [it] shall reasonably request in order to demonstrate compliance with this Section 6.06." In support of this position, Wilmington relied upon the language in the final paragraph of Section 6.06.

27.     That position, however, conflates two separate concepts in the Credit Agreement. Wilmington's obligation to release the Collateral in Section 9.14(c)(i), and the receipt of information referenced in the final paragraph of Section 6.06, are in no way related to one another: they are independent terms found in separate parts of the contract. Section 9.14(c)(i) is unequivocal, non-discretionary, and provides that when 6.06(b) is satisfied, Wilmington must "release its security interest in any Collateral." This obligation is not conditioned on its right to receive information.

28.     The final paragraph of Section 6.06 does not limit that obligation to release the Collateral. It in fact confirms it, as it provides that when the requirements set forth in Section 6.06 are met, the Collateral "shall be sold free and clear of the Liens." It then provides that, if the Company provides Wilmington with certifications or documents that Wilmington "reasonably request[ed] in order to demonstrate compliance with this Section 6.06, [Wilmington] shall take all actions it deems appropriate in order to effect the foregoing."

29.     This provision does not provide Wilmington with a "right" to receive information, or a right to refuse to evade its specific obligation in Section 9.14(c) to release the liens. Rather, it merely provides that Wilmington has an *obligation* (not a right) to "take all actions it deems appropriate to effect" the "free and clear" transfer, if and when it receives the requested information. This more general statement does nothing to impair the clear, precise, and unqualified obligation in Section 9.14(c) that Wilmington *shall* "release its security interest in the Collateral" where a sale or other disposition is permitted by the Credit Agreement.

30.     In any event, Wilmington has received all of the information that it requested and is entitled to under the Credit Agreement, and cannot rely on this misrepresentation of the agreement to avoid complying with its contractual obligations.

31.     Simply put, the Company has an express contractual right to sell its real estate under the Credit Agreement and Wilmington has no authority to prevent it.  Wilmington's refusal to release its security interest in the property the Company sells thus constitutes an intentional breach of its obligations under the Credit Agreement.

**Wilmington's Wrongful Conduct Has Harmed and Continues to Harm the Company**

32.     Wilmington's refusal to comply with its contractual obligations has already caused the Company significant harm, and will continue to do so absent the Court's intervention.

33.     The longer Wilmington persists in failing to abide by the express terms of the Credit Agreement, the more time and opportunity slips away for the Company to sell the properties at what it had determined is an opportune time.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

34.     Steak n Shake hereby repeats and realleges each and every allegation made in paragraphs 1 to 33 as if they were fully set forth herein.

35.     In light of Wilmington's refusal to comply with the terms of the Credit Agreement, an actual and justiciable controversy exists between Steak n Shake and Wilmington regarding Wilmington's obligations under the Credit Agreement.

36.     Steak n Shake requests a declaratory judgment that its real estate sales are expressly permitted by and comply with the terms of the Credit Agreement in all respects, that Wilmington must release any collateral it holds over the property Steak n Shake sells, that in refusing to release

the collateral Wilmington has engaged in willful misconduct and acted in bad faith, and that Wilmington must comply with all of its other obligations set forth in the Credit Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Steak n Shake respectfully requests that the Court enter judgment in its favor as follows:

a. Declaring that Wilmington must release any liens or collateral it holds over the property Steak n Shake sells, and must comply with all of its other obligations set forth in the Credit Agreement;

b. Declaring that the Company's real estate transactions are expressly permitted by and comply with the terms of the Credit Agreement in all respects;

c. Declaring that Wilmington has engaged in willful misconduct and acted in bad faith in refusing to release the collateral Steak n Shake plans to sell;

d. Enjoining Wilmington from exercising any purported remedy under the Credit Agreement as a result of the real estate transactions or any asserted default or event of default under the Credit Agreement;

e. Awarding Steak n Shake compensatory and consequential damages;

f. Awarding Steak n Shake costs, disbursements, and attorneys' fees of this action; and

g. Awarding Steak n Shake such other and further relief as the Court may deem just and proper.

August 4, 2020                           Respectfully submitted,
Greenwich, Connecticut


                                         LATHAM & WATKINS LLP


                                         By: /s/ Christopher J. Clark
                                             Christopher J. Clark

                                         885 Third Avenue
                                         New York, New York 10022
                                         Tel:  (212) 906-1200
                                         Fax: (212) 751-4864
                                         Email: chris.clark@lw.com

                                         *Attorneys for Steak n Shake Inc.*
                                         *(f/k/a Steak n Shake Operations, Inc.)*