UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/3/2020_____
```

STEAK N SHAKE,  :

                   Plaintiff,  :

            -v-  :

WILMINGTON TRUST, NATIONAL ASSOCIATION.,  :

               Defendant.  :

------------------------------------------------------------------------X

20-cv-6096 (LJL)

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:

       Steak n Shake Inc. ("Steak n Shake" or "Plaintiff") is a nationwide fast-casual restaurant chain, operating with 337 locations in 16 states as of June 30, 2020.[1]  Like so many businesses impacted by the Covid-19 pandemic, it has been forced to sell assets and makes changes to its business operations in order to survive.  On March 29, 2014, it and two of its subsidiaries entered into a Credit Agreement ("Credit Agreement") with certain lenders ("Lenders") through which it obtained $220,000,000 of credit in the form of term loans (the "Loans").  The Loans are secured by certain Steak n Shake assets, including real property that it owns and uses to operate its restaurants.  The Credit Agreement permits Steak n Shake to sell its real and other property under certain conditions.  Depending on other conditions, Steak n Shake must use the proceeds of any such sale either to prepay the Loans or reinvest in its business.  The instant matter arises because Steak n Shake would like to sell certain of its properties and reinvest the proceeds in its business.  Defendant Wilmington Trust, National Association ("Wilmington" or "Defendant"), the Collateral Agent and Administrative Agent under the Credit Agreement, has to date declined

---

[1] The following facts are drawn from the Complaint, declarations, and exhibits submitted by the parties at Dkt. Nos. 1, 8-9 and 14-15.

to release the security interests it holds in those properties (the "Liens") for the benefit of the Lenders.  Its refusal to do so has prompted this lawsuit and the current motion, which seeks a mandatory injunction, compelling Wilmington to release the Liens.

The Complaint was filed on August 4, 2020. Over two weeks later, on August 19, 2020, Plaintiff filed an Proposed Order to Show Cause why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure "preliminarily mandating Wilmington to comply with the credit agreement the parties entered into, which requires Wilmington to release its security interest in the assets Steak n Shake plans to dispose of . . . ." Dkt. No. 6 at 1.  With its motion, Plaintiff submitted a single declaration, that of its Chief Financial Officer Steven L. May ("May"). Dkt. No. 9 ("May Decl. I").  Plaintiff seeks relief by September 3, 2020, the scheduled date for the auction at which it seeks to sell the assets.  The Court held a conference on Thursday, August 20, 2020, during which it set a schedule for a hearing on the motion for an injunction.  At that conference, Plaintiff's counsel admitted that the relief being sought was in the form of a mandatory injunction.  The Court permitted Plaintiff to file any supplementary evidence it intended to rely upon in support of the injunction by August 21, 2020.  The Plaintiff filed a supplemental declaration by Mr. May.  Dkt. No. 14 ("May Decl. II").  Defendant filed its memorandum in opposition on August 26.  Dkt. No. 16.  With its papers, it filed a declaration of David Orlofsky, a managing director at AlixPartners LLP, a financial and operating consulting firm engaged by defense counsel beginning in June 2020 to conduct due diligence on Steak n Shake on behalf of Wilmington and certain Steak n Shake lenders.   Dkt. No. 15 ("Orlofsky Decl.") at 1-2.  Plaintiff filed its reply on August 28.  The Plaintiff having indicated it is prepared to rest solely on its papers (and having the burden of proof), the Court denied Defendant's

2

request for expedited discovery.  The Court held a hearing on September 1, 2020, at the conclusion of which it denied the request for injunctive relief.  The following spells out the Court's findings and conclusions leading to that result.

## BACKGROUND

### A.  The Relevant Parties

Steak n Shake is an Indiana corporation, with its principal place of business in Indianapolis, Indiana.  It operates a nationwide fast-casual restaurant chain, with 337 locations in 16 states as of June 30, 2020.  Dkt. No. 1 ("Complaint")  ¶¶ 7, 11.  It is a subsidiary of Biglari Holdings, Inc. ("Biglari"), a public company with SEC reporting obligations.

Wilmington is a Delaware corporation and a bank and trust company with its principal place of business in Wilmington, Delaware.  Complaint ¶ 8.

### B.  The Credit Agreement

On March 19, 2014, Steak n Shake and two of its subsidiaries entered into a credit agreement ("Credit Agreement") through which certain lenders agreed to extend $220,000,000 of credit to Steak n Shake (the "Loans").  *See* Credit Agreement.  The loan is scheduled to mature on March 19, 2021.  Credit Agreement 24.  Jeffries Finance LLC originally served as Collateral Agent and Administrative Agent for the Lenders, but Wilmington succeeded Jeffries Finance LLC in those roles.  May Decl. 1 ¶. 6.

Section 6.06 of the Credit Agreement provides that Steak n Shake and its subsidiaries are prohibited from disposing of any property, subject to certain limited exceptions.  It provides:

> Each Loan Party warrants, covenants and agrees with the Administrative Agent, the Collateral Agent, the Issuing Bank and each Lender that, so long as this Agreement shall

3

remain in effect and until the Commitments have been terminated and the principal of and interest and premiums (if any) on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full and all Letters of Credit have been cancelled or have expired or have been Cash Collateralized and all amounts drawn thereunder have been reimbursed in full, no Loan Party will, nor will they cause or permit any Subsidiaries to:

. . .

Effect any Asset Sale, or agree to effect any disposition of any property, except the following shall be permitted: . . . (b) other dispositions of property; *provided* that (i) the aggregate consideration received in respect of all dispositions of property pursuant to this clause (b) shall not exceed $50,000,000 during the term of this Agreement, (ii) such dispositions of property are made for Fair Market Value and on an arms-length commercial basis, (iii) at least 80% of the consideration payable in respect of such disposition of property is in the form of cash or Cash Equivalents, and (iv) Borrower uses the proceeds of the disposition to prepay the Loans as and to the extent required by Section 2.10(c).

. . .

To the extent the requisite Lenders under Section 10.02(b) waive the provisions of this Section 6.06, with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.06, such collateral (unless sold to a Company or an Affiliate thereof), but not the proceeds therefore, shall be sold free and clear of the Liens created by the Security Documents, and, so long as Borrower shall have previously provided to the Collateral Agent and the Administrative Agent such certifications or documents as the Collateral Agent and/or the Administrative Agent shall reasonably require in order to demonstrate compliance with this Section 6.06, the Collateral Agent shall take all actions it deems appropriate in order to effect the foregoing.

Credit Agreement 97, 104-105.

Section 2.10(c) provides:

Asset Sales.  Not later than three Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by any Company, Borrower shall apply 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.10(g) *provided* that: (i) so long as no Default or Event of Default shall then exist or would arise therefrom, such proceeds shall not be required to be so applied on such date to the extent that Borrower shall have delivered an Officer's Certificate to the Administrative Agent on or prior to such date stating that such Net Cash Proceeds are reasonably expected to be reinvested in fixed or capital assets of any Loan Party within 360 days following the date of such Asset

Sale (which Officer's Certificate shall set forth the estimates of the proceeds to be so expended); provided that, if the property subject to such Asset Sale constituted Collateral, then all property purchased or otherwise acquired with the Net Cash Proceeds thereof pursuant to this subsection shall be made subject to the first priority perfected Lien (subject to Permitted Liens) of the applicable Security Documents in favor of the Collateral Agent, for its benefit and for the benefit of the other Secured Parties in accordance with Sections 5.11 and 5.12; and (ii) if all or any portion of such Net Cash Proceeds is not so reinvested within such 360-day period, such unused portion shall be applied on the last day of such period as a mandatory prepayment as provided in this Section 2.10(c).

*Id.* 51-52.

Section 8.01 sets forth the Events of Default.  It includes as an Event of Default that "default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in Sections 5.01, 5.02, 5.03(a), 5.04(a), 5.08, 5.11, or 5.15 or in Article VI . . . ." *Id.* 115.

C.  The Proposed Sale of Real Property and Liens Dispute

Steak n Shake has been afflicted by the unprecedented disruption afflicting many restaurants in the wake of the Covid-19 pandemic.[2]  Prior to the onset of the pandemic, it was considering strategic options, including the sale of real estate, to boost stagnating sales and increase profitability.  The proceeds of the real estate sales would be reinvested back into the business.  May Decl. I ¶¶ 8-9.  When the pandemic emerged, in March 2020, Steak n Shake's plans to sell those assets apparently became more exigent.  *Id.* ¶ 10.

---

[2] With its application for a mandatory injunction, Steak n Shake has submitted an article from Bloomberg News indicating that "[a] new forecast projects that one in three U.S. restaurants may close permanently this year" and that "[a]s many as 231,000 of the nation's roughly 660,000 eateries will likely shut down this year."  May Decl. I, Ex 4.

As early as June 2020, Steak n Shake and Wilmington, accompanied by certain of the Lenders, had conversations with Steak n Shake about Steak n Shake's potential plans for real estate sales and Wilmington's corresponding requests for information.

On July 20, 2020, Steak n Shake, through its counsel, wrote to Wilmington.  Orlofsky Decl., Ex. F ("July 20, 2020 Letter").  The letter informed Wilmington of Steak n Shake's intent to dispose of 15 properties at public auction at Fair Market Value for 100% cash consideration and stated that the Expected Net Cash Proceeds of such sale was "expected to be $7-10 million." *Id*. at 2.  It also represented that "to the extent not reinvested pursuant to Section 2.10(c) of the Credit Agreement, such Net Cash Proceeds shall be applied to prepay the Loans in accordance with Section 2.10(c)." *Id*.  The letter attached a form of certification that Steak n Shake intended to submit attesting, among other things, to the fact that "[t]he aggregate consideration in respect of the Released Collateral and all previous Asset Sales of property pursuant to Section 6.06(b) of the Credit Agreement does not exceed $50,000,000" and that "[t]he Borrower shall use the proceeds of disposition of the Released Collateral to prepay the Loans as and to the extent required by Section 2.10(c)." *Id*. at 6.  It requested that, upon receipt of that certification, Wilmington execute a mortgage release, a form of which was also attached to the letter.  *Id*. at 8-13.

Steak n Shake did not wait for a response.  On July 23, 2020, it retained a firm named Keen-Summit Capital Partners, along with its local partner NAI Global, to sell the 15 properties in the Steak n Shake portfolio.  May Decl. II, Ex. 10 at 3.

Wilmington refused to release its security interests on the collateral and instead demanded information about the sales prior to releasing the liens.  May Decl. I ¶ 17.  In a July

27, 2020 letter, Wilmington noted that the last paragraph of Section 6.06 of the Credit

Agreement provided that, as a condition of the Collateral Agent taking any action to release its

lien, the Borrower, Steak n Shake, must provide to the Agent such certifications or documents as

the Agent shall reasonable request in order to demonstrate compliance with Section 6.06 of the

Credit Agreement.  Orlofsky Decl. Ex. G ("July 27, 2020 Letter") at 3.  Wilmington demanded

the following documents:

> (1) Documents indicating the amount of consideration received by the Borrower from
> each disposition of Cracker Barrel Shares and Lion Fund Interests that the Borrower
> agreed to effect since the Closing Date, and under which exception to the asset sale
> covenant in Section 6.06 of the Credit Agreement each such disposition was
> consummated;

> (2) A certification as to the amount of unused capacity that will exist, immediately prior
> to the consummation of the Contemplated Asset Sales, under Section 6.06(b) of the
> Credit Agreement, and documentation evidencing the amount of aggregate consideration
> received from asset dispositions previously consummated pursuant to Section 6.06 of the
> Credit Agreement; and

> (3) Documents setting forth the expected Net Cash Proceeds to be received from the sale
> of each of the real properties contemplated to be sold as part of the Contemplated Asset
> Sales …, and the documents (including documents describing the condition of each
> [property that is part of the Contemplated Asset Sales] and other information relevant to
> the value thereof) that the Board of Directors of each applicable Loan Party relied upon
> in determining that such Net Cash Proceeds for each such Specified Property constitutes
> Fair Market Value.

> *Id*.

Wilmington further informed Steak n Shake of its obligation under Section 5.03 of the

Credit Agreement to maintain its properties in good repair, working order and condition.  *Id*. at 4.

The July 27, 2020 Letter noted that the Agent and certain Lenders had formed a steering

committee with respect to matters related to Steak n Shake and such committee had made prior

requests for information pursuant to Section 5.01(h) of the Credit Agreement, which requests had

7

gone unanswered.  It stated: "As you are aware, the failure of the Borrower to furnish [the information] constitutes an Event of Default."  *Id.* at 4.  The July 27, 2020 Letter concluded with an offer to engage with discussions with Steak n Shake "to further our mutual goals of preserving and maximizing value for all stakeholders, ensuring the Borrower's continued viability and best positioning it for future success."  *Id.*

The reference in Wilmington's July 27, 2020 Letter to "Lion Fund Interests" was to certain investments Steak n Shake had in the "Lion Funds" (which include Lion Fund, L.P. ("Lion Fund I") and Lind Fund II, L.P. ("Lion Fund II")), which are hedge funds owned and controlled by Biglari at the time of the closing of the Credit Agreement.  At the time the Credit Agreement was closed, the value of Steak n Shack's interest in the Lion Funds was $125 million. Orlofsky Decl. ¶ 12.  After closing, Steak n Shake made an additional $50 million investment for Lion Fund Interests.  *See also Id.*  From Steak n Shake's most recent financial statements, the current value of the investments in the "Lion Funds" has been reduced to just over $7.6 million. *Id.* ¶ 13.

The reference in Wilmington's July 27, 2020 Letter to "Cracker Barrel Shares" was to 775,190 shares of the common stock of Cracker Barrel Old Country Store, Inc. owned by Steak n Shake at the time it entered the Credit Agreement.  Those shares currently have a value of more than $120 per share.  Orlofsky Decl. ¶ 19.  Shortly after the closing of the Credit Agreement, Steak n Shake contributed the Cracker Barrel Shares to Biglari and received Lion Fund II shares in exchange.  *Id.* ¶ 21.  That transaction would only be permitted under the Credit Agreement if the aggregate amount of "Lion Fund Interests" did not exceed the amount of "Cracker Barrel Shares" and Steak n Shake provided notice to the Collateral Agent and Administrative Agent

(defined in Credit Agreement Preamble) in reasonable detail. *Id.*; Credit Agreement §§ 6.04(b), 6.06(d), at 102, 105.

Steak n Shake responded on July 30, 2020. Orlofsky Decl., Ex H ("July 30, 2020 letter"). Steak n Shake asserted, without further information, that "the dispositions of Cracker Barrel Shares and Lion Fund Shares … were not effectuated pursuant to **Section 6.06(b)**." *Id* at 2. It also attached a half-page schedule purporting to show that it had at least $42,304,000 remaining of the $50 million cap under Section 6.06(b). *Id* at 5. It asserted: "In respect of the Net Cash Proceeds to be received from the sale, the Borrower intends to sell such property pursuant to a public auction to establish Fair Market Value, which the Boards of Directors of the applicable Loan Parties have determined in good faith establishes such Fair Market Value." *Id*. at 2. Steak n Shake set a deadline for Wilmington's response of the following day, July 31, 2020, at 3:00 p.m. and threatened that, if Wilmington did not release the liens by that date, Steak n Shake would institute legal action for damages or other appropriate relief. *Id*. at 4.

On July 31, 2020, Wilmington responded to Steak n Shake. Orlofskly Decl., Ex I ("July 31, 2020 Letter"). It reiterated its position that its obligation to release the liens was contingent upon Steak n Shake's response to Wilmington's reasonable requests for information pursuant to Section 6.06(b). It also reiterated its request that Steak n Shake provide documentation indicating the amount of consideration received by Steak n Shake from each disposition of Cracker Barrel Shares and Lion Fund Interests that Steak n Shake agreed to effect since the Closing Date and under which provisions of the Credit Agreement each such disposition was consummated.

On August 4, 2020, Steak n Shake filed this suit seeking a declaratory judgment that Steak n Shake's contemplated real estate sales were authorized by and in compliance with the

Credit Agreement.  It did not seek any injunctive relief or allege any irreparable harm.  The complaint did not mention an auction planned for September.

That same day, Steak n Shake took several other actions.  Through an Ad Hoc Committee of the Board of Directors, it "reviewed and finalized the Bidding Procedures for an auction of 15 properties of the Corporation and agreed on Bid Deadline of August 31, 2020 and an auction of September 3, 2020."  May Decl. II, Ex. 6.

Steak n Shake also approved a marketing flyer and a press release announcing the auction and distributed the press release.  *Id.*, Ex. 10.  The marketing flyer announced a bid deadline of August 31 and an auction scheduled for September 3 and listed the fifteen properties for sale. *Id.*, Ex. 9.

Through its counsel, Steak n Shake also responded to Wilmington.  May Decl. II, Ex. 5 (the "August 4, 2020 Letter").  It asserted that the sale of collateral free and clear of the liens was "not contingent upon the provision of any information to the Administrative Agent" and that the language in the last paragraph of Section 6.06 referred only to "the obligations of the Administrative Agent to effect the free and clear sale."  *Id.*  It also asserted that Steak n Shake had complied with the obligation to respond to reasonable requests for certifications or documents:  "In the case of the particular transactions at hand, the only issue is compliance with Section 6.06(b) and, to that end, you have already been provided a year-by-year calculation of the dispositions that may have used capacity under Section 6.06(b)."  *Id.*  Steak n Shake asserted that the amounts in that calculation "tie[d] to the Borrower's financial statements" which had been audited by an independent accountant and as to which Wilmington separately had access. *Id.*  The letter continued: "Your continued request for information regarding the Cracker Barrel

Shares and the Lion Fund Interests are not within the scope as we have already indicated that such dispositions are permitted pursuant to other clauses within Section 6.06 and such information is irrelevant as to which the particular sale at issue complies with Section 6.06." *Id.* The August 4, 2020 Letter did not mention the auction the Ad Hoc Committee had resolved to go forward with that same day.

The following day, Steak n Shake's advisor distributed the press release and its marketing flyer to its proprietary database and activated a virtual data room with available due diligence materials and bidding procedures.  May Decl. II, Ex. 10.

D.  The Proposed Auction

Steak n Shake made an initial set of bidding procedures available to potential bidders in its virtual data room on August 5.[3]

Steak n Shake updated the Bidding Procedures on August 21, 2020 (the "Updated Bidding Procedures").  The Updated Bidding Procedures announced an auction set for the "Auction Date (or on an adjourned date)."  May Decl. II, Ex. 8.  The Auction Date is "September 3, 2020 at 11:00 am EST."  *Id.* at 2.  The Updated Bidding Procedures note, however, that "[t]he Seller reserves the right to change the location and time of the Auction.  *Id.* at 7.  The properties for sale are the 15 parcels, which will be sold either "individually or collectively."  *Id.* at 3.  The bid deadline was Monday, August 31, 2020.  *Id.*  In order to bid, bidders are required to submit certain Required Bid Documents, including a deposit of 10% of the bid amount, an irrevocable offer to purchase the properties on an as is where is all cash basis, information about financing,

_____

[3] Those procedures have not been made available to the Court.

and "[a]ny other information that the Seller may reasonably request which would enable Seller to evaluate, among other things, the Bidder's ability to consummate a transaction, the Bidder's legal authority to Bid, and/or the Bidder's ability to fulfill its obligations in connection therewith." *Id*. at 6.  The Seller's commitment to sell is subject to the "best and final Bid exceed[ing] the Reserve Price" (which is set at $367,000 for each property and $5,500,000 for all fifteen properties) *Id*. at 4.  The Seller has the right to "ascertain, in the exercise of its reasonable business judgment, whether a Bid is a Qualified Bid," and can—in the exercise of that judgment—determine that a bid is not qualified. *Id*. at 7.  The Seller also has discretion to determine "what constitutes the first and second 'highest and best' Bids." 7(d). *Id*. at 8. Importantly, the auction rules do not provide that the Seller will have obtained a release of the liens prior to a bid being accepted and the date of closing.  They state: "The Seller shall receive Bids at the Auction for the Property with the intention of selling the Property to the Successful Bidder, *subject to the consent of the mortgagee to the release of its liens*." *Id*. at 8 (emphasis added).

The Update Bidding Procedures set forth a four-step process for sale of the properties. Step One is due diligence.  Potential bidders are able to conduct diligence by contacting the advisor or accessing the virtual data room.  Step Two is the Bid Deadline, of August 31, 2020. Bidders were required to submit Required Bid Documents along with their bid and deposit by 3:00 p.m. on August 31, 2020.  Step Three is the Auction.  "Provided that a Property is not already sold, then Seller shall Auction the Property on the Auction Date at the Auction Venue." *Id*. at 7.  "Based upon the terms of the Qualified Bids, the level of interest expressed in the Property and such other information as the Seller may determine to be relevant [Steak n Shake

has the right] to amend the procedures set forth herein and to adopt, at any time, in its reasonable business judgment, such rules for the bidding process which it determines will better promote the goals of the bidding process." *Id*. At the conclusion of the Auction, the winning bidder and the back-up bidder are required to update and re-execute their Real Estate Purchase Contracts and, in the case of the Successful Bidder, to supplement its deposit so it equals ten percent of the winning bid. Step Four is the Closing, which "shall occur in accordance with the terms of the Real Estate Purchase Contract." *Id*. at 9.

Steak n Shake received status reports from its advisors on the state of the marketing of the properties on August 14 (before its motion for an injunction) (the "August 14 Update") and August 20, 2020 (the "August 20 Update"). The August 14 Update relayed that as to some properties there was "decent initial interest" or "some initial interest," while as to others it reported that marketing was a "challenge," or that the location of the property "has not been successful for many fast food chains." May Decl. II, Ex. 10. The August 20, 2020 Update reported that as to some properties the advisor had been able to conduct or schedule tours for interested bidders, but as to others, "[t]he deal is tracking lightly," or "there have been no requests for tours," or "most are not interested stating [*sic.*] the COVID19 and the unknowns for Q4." May Decl. II, Ex. 11.

On August 10, 2020, the Ad Hoc Committee met to consider two separate offers for the 15 properties received by Steak n Shake. It resolved not to go forward with one offer but to move forward with the second provided that the transaction closed on or before August 27, 2020. May Decl. II, Ex. 7.

DISCUSSION

A.  <u>Standards for a mandatory preliminary injunction</u>

An injunction is an extraordinary remedy.  To establish an entitlement to it, the party

seeking relief must prove all of the following elements: (1) a likelihood of success on the merits;

(2) that the injunction is necessary to prevent irreparable harm; (3) that the preliminary

injunction is in the public interest; and (4) that the balance of hardships tips decidedly in the

moving party's favor.  *See Metro Taxicab Bd. Of Trade v. City of New York*, 615 F.3d 152, 156

(2d Cir. 2010).  Where, however "(i) an injunction will alter, rather than maintain, the status quo,

or (ii) an injunction will provide the movant with substantially all the relief sought and that relief

cannot be undone even if the defendant prevails at a trial on the merits," the Second Circuit

requires the movant to meet a higher standard.  *Tom Doherty Assocs., Inc.  v. Saban Ent., Inc.*, 60

F.3d 27, 33-34 (2d Cir. 1995).  The movant must make "a clear showing that [it] is entitled to the

relief requested, or [that] extreme or very serious damage will result from a denial of preliminary

relief."  *Id.* (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)); *see also Yang

v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020); *Patrick v. Local 51, American Postal Workers

Unio, AFL-CIO*, 2020 WL 703392 at *2 (S.D.N.Y. Feb. 11, 2020); *JN Contemporary Art LLC v.

Phillips Auctioneers LLC*, 2020 WL 4014985 (S.D.N.Y. July 15, 2020).

In *Tom Doherty Assocs.*, the Second Circuit stated:

If the use of a heightened standard is to be justified, the term 'all the relief to which a
plaintiff may be entitled' must be supplemented by a further requirement that the effect of
the order, once complied with, cannot be undone.  A heightened standard can thus be
justified when the issuance of an injunction will render a trial on the merits largely or
partly meaningless, either because of temporal concerns, say, a case involving the live
televising of an event scheduled for the day on which preliminary relief is granted, or
because of the nature of the subject of the litigation, say, a case involving the disclose of
confidential information.  The bottom line is that, if a preliminary injunction will make it

14

difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial or clear showing of, likelihood of success to obtain preliminary relief."  60 F.3d at 35.

B.  Irreparable harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation omitted).  "[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. at 118 (quotation omitted).   The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).  Moreover, where as here the movant is seeking a mandatory injunction, it must make a "strong showing" of irreparable harm. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d. Cir. 2015); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (same); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) ("A mandatory preliminary injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.").

Plaintiff's proof is insufficient to establish irreparable harm.  Plaintiff relies only on declarations from its Chief Financial Officer Steven L. May.  May's declaration, submitted with the motion for injunctive relief, includes a number of conclusory assertions of harm that might follow postponement of the September 3 auction, including:

- "I *understand* from the Company's advisers that there is a limiting and vanishing time horizon for Steak n Shake to successfully execute its real estate transactions."  May Decl. I ¶ 22 (emphasis added).

- "I *understand* from the Company's advisors that, given the unpredictable nature of the ongoing pandemic and its effect on the economy, there is no telling whether the offers that the Company has received for the[] properties will exist at the same prices—or at all—months or years from now." *Id.* ¶ 24 (emphasis added).

- "I further *understand* that canceling the auction after soliciting interest from these potential buyers would also cost Steak n Shake invaluable credibility and goodwill in the real estate market, making it even more difficult to market the properties at favorable prices in the future." *Id.* (emphasis added)

- "…given the unprecedented rate at which restaurants have been liquidating, the additional restaurant closures and real property sales will saturate the market with the same type of real estate Steak n Shake currently plans to sell, thereby diminishing its property values.  Steak n Shake had been planning to promptly reinvest the proceeds from those sales into its business, and will be unable to do so in this critical time unless it can immediately execute these sales for the best possible value.  Without such action, Steak n Shake will not only lose business opportunities, customers, and revenue, but also fall behind its competitors, who are already adapting to the change in consumer preferences.  In light of this, the Company fears—based on the input of its advisors—that it will be forced to immediately close a number of its restaurants, lay off many of its employees, and lose franchise partners who are depending on upgrades to the restaurants that they operate." *Id.* ¶ 25.

In a supplementary declaration, May repeats:

- "I *understand* that, given the unpredictable nature of the ongoing pandemic and its effect on the economy, there is no telling whether the offers that the Company has received for these properties will exist at the same prices – or at all – weeks from now."   May Decl. II ¶ 30 (emphasis added).

He further declares that he:

- "understand[s] that suddenly canceling the auction after soliciting interest from these potential buyers would also cost Steak n Shake invaluable credibility and goodwill in the real estate market, making it even more difficult to market the properties at favorable prices in the future." *Id.*

16

As to the need for the cash, all that is offered is the statement that:

- "In light of the rapidly changing nature of the restaurant industry, with each day that passes without adaptation, Steak n Shake will lose invaluable business opportunities, market standing, and good will" (decl 31) and "[w]ithout these proceeds, Steak n Shake will likely lose franchise partners and vendors who are depending on these investment updates, and who are critical to the Company's ongoing operations." *Id.* ¶ 32.

Conspicuous by its absence is any statement from the Company's advisors that Steak n Shake has or is likely to get favorable bids at the September 3 auction if it goes forward, that there will be any harm to Steak n Shake whatsoever (reputationally or otherwise) from postponing the Auction, or that Steak n Shake would not be able to get the same or better prices for its real estate if the auction were postponed. Indeed, neither the instant dispute nor the failure to release the liens restricts Steak n Shake from proceeding with the auction as scheduled; as Steak n Shake conceded at oral argument, the Bidding Procedures contemplate only that the liens would be released at the time of closing. That is the ordinary time period at which a lien must be released and the seller is able to sell its property free and clear.

Furthermore, as Wilmington pointed out at argument, the date by which bidders were required to submit irrevocable bids has already passed without Wilmington providing an advance guarantee that it would release the liens. That date was August 31, 2020. *See* May Decl. II, Ex. 8. Either Steak n Shake has already suffered the harm it fears—in which case an injunction would not help it much, or it did not suffer harm at all. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (harm must be "continuing" to satisfy the standard for a preliminary injunction). In either event, Steak n Shake has not established irreparable harm at this date.

Indeed, although the basis for Steak n Shake's application is the purported need for the cash to be generated in a sale for reinvestment in its business, absent is any statement of fact by a

17

person with knowledge that Steak n Shake needs cash to adapt its business or about the business opportunities Steak n Shake would pursue if it had that cash. Also absent are specifics as to when Steak n Shake needs to act in order to exploit the business opportunities, the identities of the franchise partners and vendors "who are critical to the Company's outstanding operations," the basis for Steak n Shake's belief it "will likely lose" those partners and vendors if it does not provide investment updates (and why that belief is anything more than speculation), and—if Steak n Shake is truly at risk of losing its critical partners and vendors—why it is that it believes that whatever investments Steak n Shake will make with the cash it generates from the sales will be sufficient to hold those partners and vendors. Steak n Shake's claim that Wilmington's action is causing it irreparable harm is truly speculative.

May's declared "understanding" that Steak n Shake may incur harm by a postponement of the auction cannot establish that Steak n Shake, in fact, faces a substantial risk of harm from a postponement of the auction. As Defendant points out, Steak n Shake has offered no declaration from an expert in the commercial real estate market addressing the outlook for properties like those at issue here or establishing that a postponement of the auction would cause Steak n Shake anything more than speculative harm. *See* Dkt No. 16 at 17. May's statement contains no more than speculation that the offers the Company has today will not actually become *better* rather than worse with the passage of time. He offers that with the pandemic, "there is no telling whether the offers that the Company has received for these properties will exist at the same prices—or at all—weeks from now." There is also no telling that the offers will not become better over the coming weeks or months. Plaintiff's assertions that its prospects for selling the properties will decline are therefore speculative, and fall well below the "strong showing" of

irreparable harm necessary for a mandatory injunction.  *New York ex rel. Schneiderman*, 787 F.3d at 650; *See Faively Transp.*, 559 F.3d at 118.

Similarly, Steak n Shake does not offer any competent evidence that the postponement of an auction will damage its credibility or make it more difficult to auction the properties in the future.  To be sure, Steak n Shake would like to offer bidders the assurance that if they bid and place a deposit, they will be able to receive the properties free and clear.  But Steak n Shake offers no reason to believe—nor is one self-evident—that if it postpones the auction to make sure it can give bidders that assurance, a person who is interested in purchasing a property today will not be similarly if not more interested tomorrow.  Under the law, "conclusory statements regarding loss of reputation are insufficient."  *Viamedia, Inc. v. Wideopenwest Finance, LLC*, 2020 WL 3415356 at *2 (S.D.N.Y. June 22, 2020).  Steak n Shake has offered no more than such statements here.

C.  Likelihood of success on the merits

"[W]here . . . an injunction is 'mandatory' . . . the movant must show a 'clear' or 'substantial likelihood of success on the merits." *New York ex rel. Schneiderman*, 787 F.3d at 650 (quoting *Tom Doherty Assocs.*, 60 F.3d at 33-34; *Beal v. Stern*, 184 F.3d 117, 123 (2d. Cir. 1999)).  Under New York law, the elements of a breach of contract claim are: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages.  *Rex Med. L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010); *Empower Energies, Inc. v. SolarBlue, LLC*, 2016 WL 5338555 at *10 (S.D.N.Y. Sept. 23, 2016).  The Court concludes that there are issues of fact as

to whether Wilmington has breached the Credit Agreement.  Steak n Shake has not shown a clear

likelihood that it will prevail on those disputed issues of fact.

The operative contractual language here is contained in the last paragraph of Section 6.06

of the Credit Agreement.  To restate, it provides:

> To the extent the requisite Lenders under Section 10.02(b) waive the provisions of this
> Section 6.06, with respect to the sale of any Collateral, or any Collateral is sold as
> permitted by this Section 6.06, such collateral (unless sold to a Company or an Affiliate
> thereof), but not the proceeds therefore, shall be sold free and clear of the Liens created
> by the Security Documents, and, so long as Borrower shall have previously provided to
> the Collateral Agent and the Administrative Agent such certifications or documents as the
> Collateral Agent and/or the Administrative Agent shall reasonably request in order to
> demonstrate compliance with this Section 6.06, the Collateral Agent shall take all actions
> it deems appropriate in order to effect the foregoing.

Credit Agreement 104-105.

That language is carefully crafted. The language that the Agent has the right to

"reasonably request" documents and certifications that would demonstrate Steak n Shake's

compliance with Section 6.06 bespeaks discretion on the part of Wilmington as the Collateral

Agent.  Its role is not ministerial.  The Credit Agreement entitles Wilmington to "reasonably

request" documents and certifications in order to assure itself (or to "demonstrate") that the sale

would be consistent with Section 6.06.  That language is not surplusage; it is intended to give

Wilmington the right to determine what documents and certifications it needs, subject only to a

duty to be reasonable and to "use good faith in making that determination." *Gilbert v. El Paso

Co.*, 490 A.2d 1050, 1054–55 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990).  It thus is not an

answer for Steak n Shake to ask the Court for a view whether, in its judgment, the requested

information is sufficient to establish that Steak n Shake has satisfied Section 6.06(b).  The

questions are whether Wilmington has gone beyond what is reasonable for an agent in its

20

position to assure itself that Steak n Shake's request would be in compliance with Section 6.06(b), and Steak n Shake has complied with those reasonable requests.

Moreover, by empowering Wilmington to ask both for certifications and documents, the Credit Agreement makes clear that it is not sufficient for Steak n Shake merely to certify that it is in compliance with Section 6.06(b).  Elsewhere, the Credit Agreement permits Steak n Shake to take certain actions merely by making a certification.  *See, e.g.,* Credit Agreement Section 2.10(c) at 51-52.  Under Section 6.06(b), by contrast, Wilmington is entitled to documents, as well as certifications, that would "demonstrate [Steak n Shake's] compliance" with Section 6.06(b).  Were it otherwise, Steak n Shake would simply be able to bypass the requirements of Section 6.06(b), and undermine the protections the Section is intended to confer on the Lenders, based on Steak n Shake's naked say-so that it would comply with the Section with no evidence whatsoever to back up that conclusory assertion (and perhaps in the face of evidence that would contradict the assertion).

Furthermore, on the face of the Credit Agreement, the obligation on the part of Wilmington to release the Liens cannot be triggered until there has been an actual sale.  This is clear from the language permitting Stake n Shake to demand documents showing compliance with the conditions under Section 6.06, and by those conditions.  Until Steak n Shake knows that there is a buyer and that the buyer is committed and able to close, Steak n Shake would not be able to demonstrate that the price reflects the fair market value or that the consideration is that required by Section 6.06(b).  Section 6.06(b) does not require that Wilmington give a blank check on the assurance that the 6.06(b) requirements will be met.

In addition, the scope of the documents and certifications that Wilmington may request to demonstrate compliance with Section 6.06(b) is not narrow as Steak n Shake suggests, but broad. It includes documents that demonstrate compliance with all four conditions of Section 6.06(b): (1) that the aggregate consideration received in respect of "all dispositions of property" pursuant to Section 6.06(b) is not greater than $50 million; (2) that the dispositions of property are made for Fair Market Value and on an arms-length commercial basis; (3) that Steak n Shake has received cash or cash equivalents in exchange; and (4) that Wilmington will "use[] the proceeds of the disposition to prepay the Loans as and to the extent required by Section 2.10(c)." That inquiry necessarily permits Wilmington to inquire into other dispositions of property and, with respect to such dispositions, and which section of the Credit Agreement permits such dispositions. If Section 6 applies to a disposition, and that disposition does not satisfy another subsection of Section 6, then it is necessarily a disposition of property under Section 6.06(b) counting against the $50 million cap.

Wilmington also may make reasonable requests for documents and certifications whether Steak n Shake's intended use of the proceeds of the real estate sales satisfies Section 2.10(c). It is a condition of Section 6.06(b)(iv) that "other dispositions of property" are permitted only "*provided* that . . . (iv) [Steak n Shake] uses the proceeds of the disposition to prepay the Loans as and to the extent required by Section 2.10(c)." That clause imposes a separate, and independent obligation, on Steak n Shake beyond that set forth in Section 2.10(c) itself. Section 2.10(c) itself requires Steak n Shake to apply 100% of the Net Cash Proceeds to prepay the loans if there is a Default or Event of Default. Nothing more would be required in the Credit Agreement to make clear that failure to do so results would result in a breach with all of the

22

remedies that a breach brings.  Section 6.06(b)(iv) does something more and different.  It does not just give rise to a claim of breach if, after the property is released, Steak n Shake uses the Net Cash Proceeds for an impermissible purpose.  It permits Wilmington before releasing the property to demand the documents and certification necessary to ensure that once the property has been sold Steak n Shake's intended use will not be violative of the Credit Agreement.

It thus follows both (1) that Wilmington is not required to release the security interests on the property if Steak n Shake plans not to use the proceeds inconsistent with Section 2.10(c) and (2) by operation of the last clause of Section 6.06, Wilmington is permitted to make reasonable requests for "certifications *or* documents," to demonstrate that Steak n Shake's use of the proceeds will be in compliance with Section 2.10(c) and therefore Section 6.06(b).  It also follows that where Steak n Shake has expressed an intent to use the proceeds to reinvest in its business, and not to prepay the Loans, and where there is basis to believe that some condition such as an Event of Default has occurred that would prevent Steak n Shake from using the proceeds to reinvest in its business, Wilmington may make reasonable inquiries.  It is not a potted plant.

Finally, the Court rejects Steak n Shake's argument based on Sections 9.04 and 9.14 of the Credit Agreement. Section 9.04 provides, in relevant part, "Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, statement, instrument, document or other writing . . . believed by it to be genuine and to have been signed, sent, or otherwise authenticated by a proper Person."  Credit Agreement 121.  It thus arguably would relieve Wilmington of liability against a claim by a Lender that it improperly relied on a certification by Steak n Shake.  But that language does not deprive

23

Wilmington of the right—set forth in Section 6.06—to ask for documents and certifications.  Nor

does it entitle Steak n Shake to mandate Wilmington to effect the release of the Liens prior to

Steak n Shake providing to Wilmington the documents and certifications Wilmington reasonably

requests.

> Section 9.14(c)(i) states:
>
> Notwithstanding anything to the contrary contained herein or in any other Loan
> Document,[4] the Administrative Agent shall (without notice to, or vote or consent of, any
> Lender, or any Affiliate of any Lender that is part to any Hedging Agreement) take such
> actions as to be required to release its security interest in any Collateral subject to any
> disposition permitted by the Loan Documents, and to release any guarantee obligations
> under any Loan Document of any Person subject to such disposition, to the extent
> necessary to permit consummation of such disposition in accordance with the Loan
> Documents . . . ."
>
> Credit Agreement 125.

This language also does not help Steak n Shake.  It imposes obligations on the Agent, and

permits the Agent to take action—without notice to or vote or consent of any Lender or affiliate

of a lender—if the disposition is permitted by the Loan Documents.  But it does not relieve Steak

n Shake of its obligations to comply with the Loan Documents.

Based on the foregoing contractual analysis, Steak n Shake has not established a clear

likelihood of success on the merits. Steak n Shake has not established that Wilmington was

acting in bad faith or unreasonably in making the requests to Steak n Shake.  Nor has it

established that it sufficiently responded to those reasonable requests.  This determination does

not finally resolve the ultimate question of whether Wilmington's requests are reasonable,

whether Steak n Shake's responses should have been sufficient, and whether it was reasonable

---

[4] Loan Document is defined as "this Agreement, the Letters of Credit, the Notes (if any), the Security Documents, each Joinder Agreement, the Existing Hedge Agreement, any other document executed in connection with this Agreement, and, except for purposes of Section 10.02(b), the Fee Letter.  Credit Agreement 28.

24

for Wilmington to persist in its requests for documents and certifications.  Both sides presented argument as to these issues and alluded to the fact that whatever the state of the evidence at the time of the motion, Steak n Shake is prepared to provide additional documents and certifications to Wilmington and that those documents and certifications may trigger Wilmington's obligations—if those obligations have not been triggered already.  That issue will have to await discovery.

### D.  The Public Interest

Steak n Shake argues that granting preliminary injunctive relief is in the public interest of requiring parties to comply with their contractual obligations. That argument presupposes that Steak n Shake has clearly shown that Wilmington has failed to satisfy its obligations.  Steak n Shake has not made that case.

### E.  The Balance of the Equities or hardships

Steak n Shake finally argues that the balance of the equities tips "strongly" in its favor because absent an injunction it will lack the capital "it urgently needs to execute its planned asset sales and reinvest the proceeds in this extraordinarily challenging business climate."  Dkt. No. 7 at 17.  By contrast, Steak n Shake argues, Wilmington (and the Lenders for which it acts) will suffer no hardship because the capital generated by the sales "will permit the Company to make much needed business improvements that will benefit all of its stakeholders." *Id*.

But just as Steak n Shake argues that it needs the capital to invest in its business, Wilmington argues that the Lenders are entitled to the properties to secure the millions they have loaned Steak n Shake—at least in the absence of a demonstration that the sales would comply with the Credit Agreement.  The equities are in equipoise.

<u>CONCLUSION</u>

For the reasons stated, the motion for a preliminary injunction is denied.  The Clerk of Court is respectfully directed to close the motion at Dkt. No. 6.

As ordered at the previous conference, the parties shall jointly submit, by 6 p.m. on September 3, 2020, a proposal for discovery or another proposal for how this case will proceed. As further ordered at the previous conference, the parties shall appear for a TELEPHONE CONFERENCE on Friday, September 4, 2020 at 10:00 a.m. to discuss case management going forward. At that date and time, the parties are directed to dial the Court's conference line at: 888-251-2909 (access code: 2123101).

SO ORDERED.

Dated:  September 3, 2020
      New York, New York

LEWIS J. LIMAN
United States District Judge

26